CONFEDERACION HIPICA DE PUERTO
RICO, INC.; CAMARERO RACETRACK
CORP.,

        Plaintiff(s),

v.

CONFEDERACION DE JINETES
PUERTORRIQUENOS, INC.,

        Defendant(s).

Civil No. 16-2256 (DRD)

## OPINION AND ORDER

Pending before the Court are: (a) *Memorandum in Support of Preliminary Injunction* filed by defendant Confederacion Hipica de Puerto Rico, Inc. (hereinafter "CHPR"), at Docket No. 153; (b) *Co-Plaintiff Camarero Racetrack's Brief in Support of its Request for Injunctive Relief and Request for Attorney's Fees for Temerity Against Confederacion de Jinetes de Puerto Rico, Inc.*, filed by plaintiff Camarero Racetrack Corp. (hereinafter "Camarero"), at Docket No. 154; and (c) *Confederacion de Jinetes Puertorriquenos Brief, in Opposition to the Issuance of the Preliminary Injunction Requested by Camarero Race Track and Confederacion Hipica de Puerto Rico,* filed by defendant Confederacion de Jinetes Puertorriquenos. (hereinafter "CJP"), at Docket No. 173.  For the reasons set forth below, the plaintiffs' request for the issuance of a preliminary injunction is granted.

## Introduction

This action was filed on June 30, 2016 by CHPR and Camarero in response to *sua sponte* actions taken by certain jockeys associations, to wit, CJP, Inc. and Asociacion de Jinetes de Puerto

Rico, Inc.[1]  Plaintiffs alleges that the cancellation of the horse races scheduled for June 30, July 1 and July 2, 2016 due to certain jockeys' boycott and refusal to ride the horses in the scheduled races constitute a violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1-7, and the Clayton Act, as the jockeys are not employees of the CHPR, an association of the owners of racing horses.  The CJP alleges that they are a union, hence, the jockeys, as employees, can legally call a boycott to plaintiffs and refuse to ride the horses, to force a payment increase for their horse mounts.

## Issue

The core of this matter is whether the CJP, which is an independent jockeys' association, may also be considered a labor union, and as such, have a right to call strikes to force plaintiffs **to increase their horse mount fees**.  It is important to note that CJP are currently not employees of CHPR and/or Camarero.[2]  Notwithstanding, there are two additional issues pending: whether the jockeys may call a strike to force plaintiffs to increase their horse mount fees, and other economic considerations, such as protection of their image in commercial advertising of the Camarero Race Track.

## Factual and Procedural Background

The facts of this case are familiar to the Court, indeed this is not the first time that the jockeys have called a boycott against the scheduled races in an effort to force the San Juan Racing Association , Inc. to grant a payment increase.  *See San Juan Racing Association, Inc. v. Jinetes de*

---

[1]    The Court wishes to clarify that the only defendant at the time of this writing is CJP, as Asociacion de Jinetes de Puerto Rico, Inc. ("Asociacion") entered into a Settlement Agreement with plaintiffs herein.  Hence, Asociacion is no longer a party in this case.  *See Amended Judgment* of August 18, 2017, Docket No. 207.

[2]    Until the CJP otherwise proves, they are independent contractors, as ruled by the United States of Court of Appeals for the First Circuit ("First Circuit"), in *San Juan Racing Association, Inc. v. Jinetes de Puerto Rico, Inc., et al.*, 590 F.2d 31 (1st Cir.1979).  *See Docket No. 46.*

*Puerto Rico, Inc., et al.*, 590 F.2d 31 (1st Cir.1979) (Coffin, J.).

In the instant case, the jockeys played a similar strategy, but this time the boycott was against the plaintiffs, that is the owners of the horses represented by CHPR, and the owner of the racetrack, Camarero. Both CHPR and Camarero have vehemently opposed to the demands of the jockeys members of the CJP. The Court held several long and extensive hearings, and allowed CJP sufficient opportunity to present their evidence, however, the Court was not persuaded by the legal arguments nor the evidence presented by the CJP, as the Court granted a preliminary restraining order at Docket No. 46.[3] Our analysis follows.

### Preliminary Injunction Standard

The Court will revisit the *Second Amended Nunc Pro Tunc Opinion and Order Re: Temporary Restraining Order*, Docket No. 46, which addresses all the facets pending before the Court. The Court will include the analysis and discussion included therein, as the legal analysis remain the same after having reviewed all the evidence presented and admitted during all the evidentiary hearings held, to allow CJP an opportunity to show the Court why the injunctive relief requested by plaintiffs was not warranted.

Plaintiffs have requested a temporary injunctive relief under Fed.R.Civ.P. 65(b)(1)(A)(B), (b)(2) followed by a preliminary injunctive relief under Fed.R.Civ.P. 65(b)(3), including damages

---

[3]     The CJP presented confusing and contradictory arguments during the course of the evidentiary hearings, for example, the CJP argued that they are an organized union under the laws of Puerto Rico, but failed to cite the applicable local or federal statute in support of their argument, or to identify their union labor employment status. At times, CJP argued that they are plaintiffs' employees, as Camarero pay them their medical insurance; but as will be discussed *infra*, when the parties signed the agreement the legal status of the CJP was one of the independent contractors. The question remains as to what the jockeys of CJP really are: (a) a union; (b) Camarero's and/or CHPR's employees, or (c) are they independent contractors? Until the CJP otherwise prove, the jockeys are independent contractors under Puerto Rico law, and the Puerto Rico Racing Board, who governs and regulates the horse racing business in Puerto Rico.

relief.

The First Circuit follows the quadripartite test, which the Court must examine and strictly comply:

(1)      likelihood of prevailing in the merits;

(2)      significant risk of irreparable harm;

(3)      the balance of hardships weigh on the movant's favor; and

(4)      whether the injunction will harm the public or third parties by granting the remedy.

*New Comm. Wireless Inc. v. Sprintcom Inc.*, 287 F.3d 1, 8-9 (1st Cir.2002); *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir. 1991). *See also Arborjet, Inc. v. Rainbow Treecare Scientific Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir.2015) (Souter, J.), wherein the Court citing *Narragansett*, held that "a party losing the battle on likelihood of success may nonetheless win the war at a succeeding trial on the merits." In the instant case, however, and after extensive evidentiary hearings, the Court finds that CJP was unsuccessful in proving that it has a legal right to call a strike to demand an increase in the horse mount fees.

In *Arbojet*, 794 F.3d at 171, the Court reaffirmed that:

> To grant a preliminary injunction, a district court must find the following four elements satisfied: (a) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest. *See Voice of the Arab world, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir.2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

The probability of prevailing has been found to be the particular "furcula" of the TRO, and has been referred as the "sine qua non" of the injunctive relief, *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir.1993) . . . to succeed in the merits, *Narragansett*, 934 F.2d at 6. Further, should a party

not be able to show likelihood of success, "the remaining factors become matters of idle curiosity." *New Comm. Wireless Inc.*, 287 F.3d 1, 9 (1st Cir.2002). Moreover, "of the four factors, the probability of success component in the past has been regarded by us as critical in determining the propriety of injunctive relief." *Lancor v. Lebanon Housing Authority*, 760 F.2d 361, 362 (1st Cir.1985). Hence, the factor of probability of prevailing constitutes the principal criteria to overpass *Le Beau v. Spirito*, 703 F.2d 639, 645 (1st Cir.1983) (ending the court inquiry after concluding that plaintiffs were unlikely to prevail on the merits).

In 1979, the First Circuit determined that the jockeys are independent contractors when engaged in a "concerted refusal to deal" in violation of the Sherman and Clayton Acts. *See San Juan Racing Association, Inc. v. Asociacion de Jinetes de Puerto Rico, Inc.*, et al., 590 F.2d 31, 32 (1st Cir.1979) (confirming antitrust injunctive relief as to a "concerted refusal to deal" by the jockeys against management of the racetrack). Further, the jockeys are not covered by the "labor dispute exemption" as premised by *Parker v. Brown*, 317 U.S. 341 (1942), which is not applicable as expressed in a similar situation of jockeys versus management of the racetrack and horse owners under state law. In *San Juan Racing Association*, the Court held:

> That they acted together, in combination, is a supportable finding on this record. (Citations omitted). Their openness does not immunize agreement. (Citations omitted). That defendants' collective refusal to deal with plaintiff until their fees were increased constituted an illegal effort to control prices through concerted action was also supportable on the pleadings and evidence before the court. (Citations omitted).
>
> . . . [but] the rates of compensation [are] compelled by state law; their whole purpose [the jockeys] is to abolish such rates [the jockeys fees as payment to ride then for San Juan Racing Assoc.] and establish new ones." (Emphasis ours).

*San Juan Racing Association*, 590 F.2d at 32. The critical factor is that the remuneration of the jockeys is "compelled" by state regulation.

Further, the actions of "concerted refusal to deal" are unrelated to actions by the management of the racetrack nor the horse owners, but they are in fact related to the current regulation issued under the governmental authority of the Commonwealth of Puerto Rico relating to the distribution of the prize money of each race. *See San Juan Racing Association, Inc. v. Asociacion de Jinetes de Puerto Rico, Inc.*, 590 F.2d at 32. Hence, the dispute is not a "labor dispute" as defined under Section 13 of the Norris-La Guardia Act, 29 U.S.C. § 113, or under the "labor dispute" definition under the Sherman and Clayton Act, 15 U.S.C. §§ 1 and 17.

The Court understands that the probability of plaintiffs prevailing in the instant case is extremely high, as the jockeys herein do not receive deductions from their salary, such as, income tax; social security, unemployment. They have the ability to choose the race they want to run, and the particular horse they aspire to run, and they may run a different horse from a different owner creating a conflict with the horse owner of the previous or later race.[4] The jockeys also pay for all the equipment they may need.

Hence, the alleged "concerted activity of refusal to deal" is a mirror image of the controversy as expressed by the court in *San Juan Racing Association, Inc. v. Asociacion de Jinetes de Puerto Rico, Inc.*, 590 F.2d at 32-33, a grievance as to the horse owners and the administrators of the racetrack, but against the "compelled" remuneration established by the Horse Racing Industry and Sport Administration, an administrative agency of the Commonwealth of Puerto Rico, which

---

[4]     Whether the jockey mounts on any particular race or horse depends on whether the particular horse owner selects the jockey to ride the horse depending on the availability of the jockey to race in a particular race. *See* Docket No. 5, page 3, par. 14-15.

regulates the horse racing industry in Puerto Rico. In the instant case, the Horse Racing administrator was requested by the jockeys to terminate the steward who fined the jockeys for a work stoppage of two races, and also refused to accept the request of the jockeys to increase their racing fees and percentage per mount and per race. The matter is not a "labor dispute" but a "dispute against the Commonwealth of Puerto Rico," and the Horse Racing Board of Puerto Rico. Notwithstanding, plaintiff CHPR initially advised that they would lobby the request before the Horse Racing Board to be resolved within ninety days.[5] The jockeys, however, refused to wait. Hence, the "concerted refusal to deal" by the jockeys continued.

The Court considers the instant case to be an almost exact replica of *San Juan Racing Association, Inc. v. Asociacion de Jinetes de Puerto Rico, Inc.*, 590 F.2d 31, as to the facts and the law, as it fails to constitute a "labor dispute" against the CHPR or Camarero, but directed to the persons who are operating and regulating the agency and the Horse Racing Board of Puerto Rico, since the government agency constitutes the exclusive power to increase the compensation of the jockeys, as far as compensation is concerned per race for the winners and/or minimum compensation per race.

The record shows that, on June 16, 2016, the AJPR indeed sent a letter to the Office of the Racing Jury Panel, and the Horse Racing Administrator regarding a conflict with certain jockeys and the delay in racing number 117 of June 10, 2016, and warning the Horse Racing Administrator that the jockeys could exercise their constitutional right to participate in a strike. *See* Docket No. 153,

---

[5] As stated above, there is no evidence presented to show that the jockeys who are associated to the CJP are employees of CHPR and/or Camarero. Indeed, it would be contrary to the provisions of law that governs the horse racing industry in Puerto Rico. *See* the Puerto Rican Horse Industry and Sport Administration, 15 L.P.R.A. §198.

page 29.  *See also* Plaintiffs' Exhibits 7 and 8 of July 19, 2016.  Mr.  Toro demanded that the conflict with the jockeys be resolved within 72 hours and declined the proposition made by Mr. Barrios, President of CHPR, to negotiate this matter within 90 days.  "On June 20, 2016, the Horse Racing Administrator replied to the letter sent by the AJPR and declined its request to act as a mediator."  *Id.*  On June 21, 2016, the president of plaintiff CHPR sent a letter to the AJPR's attorney, "informing him that a boycott by the jockeys constituted a violation of the Sherman Antitrust Act."  *Id.  See also* Plaintiff's Exhibits 7, 8, 9 of July 19, 2016.

According to Stipulated Fact "V",  "on June 24, 2016, the jockeys engaged in an illegal concerted activity, refused to register for the horses they would ride for the races scheduled for June 30 and July 1, 2016, in effect boycotting the racetrack operations and prompting the racetrack to suspend the racing operations for those two days."  "The Administration for the Industry and Horse Racing Sports, an agency of the Commonwealth of Puerto Rico, issued a certification that evidenced that, for the inscriptions held that day, the inscription tickets [to race as jockeys] were presented without any jockeys."  *See* Docket No. 153, page 30.  Furthermore, the record shows that "the races scheduled for Thursday, June 30, 2016, Friday, July 1, 2016, and Saturday, July 2, 2016 at Camarero Racetrack were cancelled due to the Defendants' refusal to ride the horses."  *See* Stipulated Fact "U", and Docket No. 153, pages 30-31.

Thus, the controversy presented in the instant case is an identical controversy as in the case of *San Juan Racing Association, Inc. v. Asociacion de Jinetes de Puerto Rico, Inc., et al.*, 590 F.2d 31, wherein then Chief District Judge Jose V. Toledo decided that an injunction for a "concerted refusal to deal" was warranted under the federal antitrust laws. The First Circuit pellucidly affirmed the district court by also clearly determining that the matter failed to constitute a "labor dispute" at

590 F.2d at 32.  (At that time the First Circuit determined that the record was not extensive, but now the record is more abundant).

As to irreparable harm, the Court understands that Camarero and CHPR are risking the permanent loss of a debilitating and dire market, as the fans of the racetrack may move to other types of sport activities or another types of gaming. Further, other gaming competitors may occupy the clients of CHPR, also individual horse owners with the racetrack closed will be unable to use the investments that they have in the horses nor effectively train the horses as the jockeys will be engaged in a "concerted refusal to deal."

The balance of equities between the parties favor the granting of the remedies under Fed.R.Civ.P. 65, as Camarero, the race track administrator, stands to potentially lose market, which involves betting, and other gaming, as well as the horse owners stand to lose the use, and investment in their horses, as well as the potential race prize profits. Further, and also critical, is that there are only thirty-six defendant jockeys, at the time of filing of the *Complaint*, and some may leave to other racetracks in other jurisdictions, but the strike affects all the employers of the racetrack including those who provide maintenance to the racetrack, and those who are at the windows of the gaming, the food concessionaires, the horse owners sub-contractors who hire grooms and other employees to safeguard, protect, feed and work with the horses are also affected, as well as to owners of the gaming agencies wherein betting is placed as to the "pool" of seven races, and as to individual races. Lastly, and most critical, the defendants' concerted refusal to deal constitutes a significant loss of revenue generated for the Commonwealth of Puerto Rico from this sport.[6]

---

[6]     It is important to note that after the devastation of Hurricane Maria, several jockeys have moved to Continental United States, which also affects adversely plaintiffs' continued operations, which may also have a potential adverse impact on the jockeys available to race the horses on the regular scheduled races. *See "Jinetes*

The public interest unequivocally also favors the granting of the injunctive relief, as the government stands to lose all the future revenues of the income generated by the use of the racetrack, as well as the revenues lost due to the cancellation of certain racing days. The fact is that the loss of revenues will be lost for good, as the racetrack nor the horse owners will be able to recuperate financially from the loss triggered by the forced closing of the racetrack operations due to the jockeys "concerted refusal to deal" on certain racing days. Moreover, an extended boycott may cost the Government of Puerto Rico millions of dollars to an Island that is currently in the verge of bankruptcy. Further, although jockeys are free to ride at other racetracks in the United States or other countries, the Camarero Racetrack can only operate in Puerto Rico, and the horse owners cannot run in other racetracks as Camarero is the only racetrack in Puerto Rico.

Finally, and above all, this type of boycott by the jockeys against the racetrack operations has already been entertained by the First Circuit in an extremely similar case, as to a prior racetrack operating then in Puerto Rico, and an identical scenario wherein the jockeys attempted to boycott the horse owners and the administrator of the racetrack San Juan Racing Association, Inc., 590 F.2d 31, in a "concerted effort to refuse to deal" unless the jockeys' fees were increased. The First Circuit ruled that the injunctive relief was warranted, as the "concerted refusal to deal" was not a "labor dispute," for the jockeys are independent contractors and lack an employment relationship with either the racetrack administrator.  Furthermore, the increase in the amount of racing fees sought by

*Puertorriquenos Preparan Sus Maletas*," [Puertorrican Jockeys Prepare Their Suitcases], at Endi.com, 09/30/2017. *See also "Preocupados por el deporte hipico de la Isla*," [Concern for the Racing Sport in the Island], at El Vocero, 10/25/2017; "*Industria Hipica crea plan de recuperacion tras el paso de Maria,*" [Racing Industry establishes a recuperation plan after the consequences of Maria], at El Vocero, 10/25/2017; "*Hipicos demandaran a Camarero,*" [Members of Confederacion Hipica de Puerto Rico and the Puerto Rico Owners Association will sue Camarero], at El Vocero, 10/30/2017; "*Juan Carlos Diaz se reencuentra con su pasion en Florida,*" [Juan Carlos Diaz [a jockey] rekindles  his passion in Florida], at Endi.com, 11/05/2017.  (Translation ours).

the jockeys were then "compelled by the state" and currently are determined by the government's Horse Racing Board. *See Columbia River Packers Assoc. v. Hinton*, 315 U.S. 143, 146-147 (1942) (stating that injunctive antitrust relief was to be granted when "the employer-employee relationship has no bearing"). Hence, plaintiffs' request is strictly to stop and unlawful refusal to deal of the jockeys, as independent contractors. " . . . [P]laintiff resort to the district court was not to determine [or evade] a new basis for compensation — something that may well be within the primary jurisdiction of the Horse Racing Board [the government agency], but to dissolve the concerted refusal to deal which defendants had engaged in. *San Juan Racing Association, Inc. v. Asociacion de Jinetes de Puerto Rico, Inc.*, 590 F.2d at 33, citing *United States v. Radio Corporation of America*, 358 U.S. 334, 346-348 (1979).[7]

In view of the fact that the evidence and the law favors the issuance of the preliminary injunction requested by plaintiffs, the same is granted in a *sine die* and continued fashion.

## Applicable Law and Discussion

### The Horse Racing Industry in Puerto Rico.

The horse racing industry in Puerto Rico is exclusively regulated by the Puerto Rican Horse Racing Industry and Sport Administration. *See* 15 L.P.R.A. § 198. Section 198a provides that: "The Puerto Rican Horse Racing Industry and Sport Administration is hereby created as a public instrumentality to regulate all facets connected with the horse racing sport in the Commonwealth of Puerto Rico, and its powers, functions and duties shall be exercised through a Racing Board and a

---

[7]     For identical rulings relating to racetracks, *see Taylor v. Local 7, International Union of Journeymen Horseshoers*, 353 F.2d 593, 602-606 (4th Cir.1965), (citing *Colombia River Packers Assoc.*, 315 U.S. at 146-147), *cert. denied*, 384 U.S. 969 (1966). As to lawyers working as individual counsel (as independent contractors for the government) representing indigents defendants engaged in a "concerted refusal to deal," the Court refers to *FTC v. Superior Court Trial Lawyers Association*, 493 U.S. 411 (1990).

Racing Administrator." Section 198b(2) defines Administrator, as the "Horse Racing Administrator." Section 198b(2) defines Administrator, as the "Horse Racing Administrator." Section 198b(2) defines Administrator, as the "Horse Racing Administrator." Section 198b(37) defines jockey, as "the person authorized to ride race horses through a license issued by the Administrator." Section 198c provides that the Horse Racing Board will be composed of five (5) persons to be "appointed by the Governor with the advice and consent of the Senate for a term of four (4) years."

Section 198e governs the Horse Racing Board powers. Section 198e(a) provides that the Horse Racing Board "is hereby empowered to regulate all matters concerning the horse racing sport."

**Jockeys are independent contractors pursuant to 15 L.P.R.A. § 198b(37).**

As stated above, jockey is the person authorized to ride race horses through a license issued by the Horse Racing Administrator. It is uncontested that the jockeys are not employees of Camarero or CHPR or trainers. *See* Docket No. 153, page 19. Moreover, "as independent contractors, jockeys are engaged by horse owners to participate in races at various tracks throughout the United States, including Camarero Racetrack." *Id. See also* Docket No. 153, page 9, Joint Exhibit IV, "Jockeys are not employees but independent contractors. Counsel Axel Vizcarra, Esq., admitted in an 'urgent memorandum' to all jockeys dated July 2, 2016 that the jockeys are independent contractors."

Furthermore, "one of the facts that support that the jockeys are independent contractors is that they are not deducted income tax, unemployment or social security taxes." The record shows that this fact was admitted for the record by Mr. Axel Vizcarra, attorney for CJP. *See* Docket No. 153, page 10. "The jockeys are free to run in one race and mount a horse from one owner, and in the next race not mount a horse from the same owner." *Id.* at page 11. "**Whether a jockey rides a particular horse in a particular race depends solely on whether an owner and/or trainer selects**

12

**him/her, and if selected, whether the jockey wants to ride that particular horse in that particular race.**" *Id.* (Emphasis ours).

"Jockeys in Puerto Rico are contracted through a 'ticket' **which is signed by the jockey or the jockey's authorized agent and the horse owner or the horses' trainer**." (Emphasis ours). *See* Docket No. 153, page 12. "Said 'ticket' constitutes the agreement among the parties for each individual race that a jockey is to ride on a horse." *Id.* "The jockeys, as independent contractors, can accept or reject to mount the horse that is offered." *Id.* "T0he 'ticket' is only valid for one race." *Id.* "**As independent contractors, the jockeys provide their own equipment, and are free of any control by the horse owners and/or trainers to whom they contract their services**." *See* Docket No. 153, page 13. (Emphasis ours).

"The jockeys that ride horses in Puerto Rico get paid for their rides 10.25% of the purse received by the horse owner if their mounts arrive in the first 6 positions." *See* Docket No. 153, page 14. "Also, regardless of the position they arrived at during the race, they get paid at least $20.00 per mount." *Id.* "As an additional income, all the jockeys get 10.25% of the monies received by the horse owners that come from the video lottery terminals (VLT)." *Id.* "Horse owners pay the mount and other fees in accordance with the terms incorporated in an official racing regulation ('the Puerto Rico Horse Racing Board')." *See* Docket No. 153, page 15. "**The compensation that the jockeys receive per mount was not determined as a result of a negotiation between horse owners and the jockeys.**" *Id.* at page 16. (Emphasis ours).

Pursuant to 15 L.P.R.A. § 198e(9), the Horse Racing Board has the power "to issue orders, rules and resolutions and take the necessary measures leading to achieve the physical safety and financial and social security of natural and juridical persons related to the horse racing industry and

sport, including the issue of orders of cease and desist should the Board believe that a person is in violation of §§ 198, 198y of this title or of the rules, regulations, orders or license requirements promulgated pursuant thereto." *See also* Docket No. 153, page 17.

The Court has examined the "test" for independent contractor both under federal and Puerto Rico law.[8] The following is a collection of cases which set forth the factors to be considered by the Court when determining whether an individual is an independent contractor. In *C.C. Eastern, Inc. v. N.L.R.B.*, 60 F.3d 855, 858 (D.C. Cir.1995), the Court held:

> Whether a worker is an independent contractor or an employee is a function of the amount of control that the company has over the way in which the worker performs his job. *Local 777, Democratic Union Organizing Committee, Seafarers International Union of North America v. N.L.R.B.*, 603 F.2d 862, 872-874 (D.C. Cir.1979) ("*Seafarers"*). As the Board itself has explained:
>
> [A]n employer-employee relationship exists when the employer reserves not the right to control the result achieved, but also the means to be used in attaining the result. On the other hand, when the employer has reserved only the right to control the ends to be achieved, an independent relationship exists. . . . Supervision of the 'means and manner' of the workers' performance renders him an employee, while steps taken to 'monitor, evaluate, and improve the results' of his work, without supervision over the means by and manner in which he does his work, indicates that the worker

---

[8]     The determination of the employer/employee status in a racetrack is made by the National Labor Relations Board who has the original and exclusive jurisdiction to make such determination, but has statutory authority to decline jurisdiction as well as to retain and exercise jurisdiction. *See San Juan Racing Association Inc. v. Labor Relations of Puerto Rico*, 532 F.Supp. 51, 54-55 (D.P.R.1982). "In cases involving the horseracing industry the Board has consistently declined to exercise jurisdiction under Sections 8, 9 and 10 of the Act over the racetracks industry, as well as over labor disputes involving employers whose operations are an integral part of the said industry *American Totalisator Co.*, 101 L.R.R.M. 1403 (1979); *Los Angeles Turf Club, Inc.*, 26 L.R.R.M. 1154 (1950); *Jefferson Downs, Inc.*, 45 L.R.R.M. 1108 (1959); *Meadow Stub, Inc.*, 47 N.L.R.B. 1202 (1961); *Hialeah Race Course, Inc.*, 45 L.R.R.M. 1106 (1959); *Walter A. Kelley*, 51 L.R.R.M. 1375 (1962); *Centennial Turf Club, Inc.*, 77 L.R.R.M. 1894 (1971); *Yonkers Raceway, Inc.*, 79 L.R.R.M. 1697 (1972), and others." . . . "Finally, it may be added that the Board's decision not to assert its jurisdiction over the horseracing industry is not irrevocable." *Id.* at page 55. "The limitations on the exercise of jurisdiction are self-imposed and it can exercise jurisdiction pursuant to the statute under any reasonable set of circumstances it deems appropriate. *International Union Progressive Mine Workers v. N.L.R.B.*, 319 F.2d 428, 435 (7th Cir.1963); *N.L.R.B. v. Okla-Inn*, 488 F.2d 498 (10th Cir.1973). "Thus, if the Board's expectations are not realized, the Board can reappraise its policy in this area taking into consideration the new developments in society and assert jurisdiction over the horseracing industry as long as its new construction is consistent with the Act. *N.L.R.B. v. Harrah's Club*, 362 F.2d 425 (9th Cir.1966); *Walter A. Kelley*, 51 L.R.R.M. 1375 (1962); *N.L.R.B. v. Wentworth Institute*, 515 F.2d 550 (1st Cir.1975)."

is an independent contractor. *See City Cab of Orlando, Inc. v. N.L.R.B.*, 628 F.2d 261, 264 (D.C. Cir.1980).

In *J. Huizinga Cartage Company, Inc. v. N.L.R.B.*, 941 F.2d 616, 619-620 (7th Cir.1991), the Court held:

> The determination of an individual's status as an employee or independent contractor is a fact-based inquiry and focuses on "the employers ability to control the purported employee." *N.L.R.B. v. O'Hare-Midway Limousine Serv.*, 924 F.2d 692, 694 (7th Cir.1991). The key factor in evaluating employer control is whether the employer governs the manner and means by which the work is accomplished. *N.L.R.B. v. Sachs*, 503 F.2d 1229, 1233 (7th Cir.1974).
>
> The Company owned, maintained and insured the trucks driven by Richardson and Toles. The drivers' hours and routes were also controlled by the Company. In addition, when they were hired both Richardson and Toles completed standard employment application form. The Company stresses that it did not deduct income tax, social security tax, or unemployment compensation from Richardson's and Toles' paychecks as support for the proposition that they were independent contractors. However, as the General Counsel recognized, if an employer could confer independent contractor status through the absence of payroll deductions there would be few employees falling under the protection of the Act.
>
> . . .
>
> Based upon substantial evidence of the control exerted by the Company over the manner and means by which Richardson and Toles performed their duties, we agree with the Board's conclusion that they were employees covered by the Act.

In *Fernandez v. Land Authority of Puerto Rico*, 104 D.P.R. 464, 1975 WL 38685 (Puerto Rico), 4 P.R. Offic. Trans. 644 (1975), the Supreme Court of Puerto Rico, set forth the factors to be considered when determining whether an individual is an employee or an independent contractor:

> **In this type of controversy there are usually characteristics traits in common to both categories, making it difficult to certainly establish sharp distinction between employee and independent contractor.** Therefore the case law has formulated several factors that should be taken into consideration upon determining the nature of the relationship between the parties mentioning, among others, the following: **1) nature, extent, and degree of control of the principal; 2) degree of initiative or judgment displayed by the truck driver; 3) ownership of**

**equipment; 4) power to hire and the right to fire; 5) manner of remuneration; 6) opportunity for profit and risk of loss, and 7) tax withholding**. *Lendron v. Labor Relations Board*, 87 P.R.R. 87 (1963); *Sec. of Labor v. Pedro A. Piza, Inc.*, 86 P.R.R. 422 (1962); *Perez v. Hato Rey Bldg. Co.*, 100 P.R.R. 880 (1972), and *Nazario v. Gonzalez*, decided on September 4, 1973, 101 P.R.R. ____.

The determination, however, does not depend on a specific factor but on the totality of the circumstances present in the relationship between the parties. We must examine, then, the factual situation which gave rise to the controversy, taking into consideration the above mentioned factors.

In our opinion, and in view of the circumstances of this case the control exercised by the Authority over appellees is insufficient to conclude, as the trial court erroneously concluded, that the relationship between the parties was one of employee-employer. (Emphasis ours).

In the instant case, the jockeys, as independent contractors, are contracted by the horse owners and/or trainers at will. The jockey is free to accept or reject the offer made by the horse owner and/or trainer. There is no contract and/or employment application, merely the signature of the jockey on the ticket corresponding to the mount of a certain horse to be raced on a certain date, at the specific race number indicated in the ticket. The jockey has the ultimate authority to accept or reject the offer made by the horse owner and/or trainer. No further commitments from the jockey's side, except to train with the horse in preparation for the race, have his/her equipment ready, and run the race. Thereafter, the jockey will be compensated accordingly, but always between the compensation set forth by the Horse Racing regulations, and the regulations set forth by the government agencies. *See* Docket No. 153, page 14.

**A Business Decision: The Right of Publicity Act.**[9]

The CJP has claimed that there was a negotiation between the Horse Racing Association and the jockeys associations wherein the CJP "bargained" with management of both the horses' owners and the race track original and successor owners.  The bargaining negotiation was simple.  Both the owner of the race track and the horses' owners, that is, Camarero and CHPR "agree[d] to fund on a 50/50 basis the monies necessary to pay [the jockeys]:

> a)     The premium of the health plan for the Jockeys (medical plan, life insurance and accident insurance) and Trainers (medical plan only).  Note: the Jockeys may substitute, on a dollar for dollar basis, the cost of valets in lieu of the cost of the Life Insurance.
>
> b)     The State Insurance Fund policy for the jockeys.
>
> The Confederacion [CHPR] and CAMARERO herein establish as "Base Year Budgets" for Item A the following amounts of $251,000.00 for the jockeys' health plan and $272,000.00 for the trainers' health plan.  The future Annual budgets for A will be considered maximum budgets and any cost over runs will be the responsibility of the respective Trainers and Jockeys Associations. . . . CAMARERO and/or The Confederacion [CHPR] will have the right to audit the records of the Jockeys Associations and Trainers Associations to insure compliance with payment of the Health Insurance Plans by these Associations.  CAMARERO will have the right to request documentation from The Confederacion to show proof of payment for the State Insurance Fund Policy for the Jockeys.

*See* Plaintiffs' Exhibit No. 2 of July 19, 2016, a Contract executed on January 23, 2007, by Confederacion Hipica de Puerto Rico and Camarero Race Track Corp.  This negotiation has been

---

[9]     Ley del Derecho sobre la Propia Imagen, 32 L.P.R.A. §§ 3151 *et seq.*  Although the Right of Publicity Act was formally enacted on July 13, 2011, it clearly states in the Statement of Motives that the cause of action stems since the year 1982.  *See Colon v. Romero Barcelo*, 112 D.P.R. 573 (1982), and the collection of cases cited therein.

agreed to by CHPR, Camarero, and the jockeys associations, to wit, CJP and AJPR.[10]

It is critical that the jockeys cannot be independent contractors for certain situations,[11] and employees for another. As stated in the collection of cases cited above, the determination of whether an individual is an independent contractor or an employee rests on control of the employer over the employee, as well as the totality of the circumstances.

In the instant case, the fact remains the plaintiffs made a decision to include the jockeys in their liability policies for the benefit of both plaintiffs and jockeys, but also the jockeys surrendered any rights that they may have as jockeys of their images taken during the course of the races in exchange for the payment of the health insurance plan; accident insurance plan; life insurance policy, and the policy of the Puerto Rico State Insurance Fund, which must be paid individually by all independent contractors.

If the jockeys were indeed employees of plaintiffs, they would not have been able to negotiate this benefits, as that would have been forced to accept whatever terms and conditions the employer's contract provides.

Notwithstanding, it is now critical to review the applicable provisions of The Right of Publicity Act ("the Act"). The Act defines "accessory figure" as, "[a] person who is not the focus of a communication, but rather a part of a group or background figure." *See* 31 L.P.R.A. § 3151(g).

---

[10]     Asociacion de Jinetes de Puerto Rico (AJPR) is no longer part of this case, but indeed agreed to the provisions of the contract of January 23, 2007 entered into by Camarero and CHPR.

[11]     "The jockeys are not employees but independent contractors." *See* Complaint, Docket No. 1, ¶ 15. "Camarero does not control a jockeys's work in any manner. Camarero does not hire or fire jockeys." *Id*., ¶ 16. *See also* "Urgent Memorandum" from Atty. Axel Vizcarra Pellot - President, to "All Jockeys" dated July 2, 2017, and admitted and Joint Exhibit IV on August 16, 2016, which states: "**The order issued by the Hon. Judge Dominguez does not affect your rights as independent contractors to accept or reject mounts when so determine, among others, as part of your individual professional practice**." (Emphasis ours).

Section 3154 of the Act provides: "The rights under this chapter shall be freely transferable and descendible property rights, in whole or in part, to any person or incorporated entity by written transfer, included but not limited to, a signed agreement among the parties, powers, licenses, donations, and wills, or by intestate succession."  Most importantly are the exceptions provided by the Act, under Section 3157:

> This chapter shall not apply under the following circumstances:
>
> (a)    When an individual's likeness is used in any medium as part of a news report, political expression, **sporting**, or artistic event transmission, **or presentation with a legitimate public interest**, and where said likeness is not used with commercial or publicity purposes.
>
> . . .
>
> (d)    When the likeness of an accessory figure is used.  (Emphasis ours).

After having reviewed the provisions of the Act, it is clear that these provisions are inapplicable to an employer-employee relationship, as the employee in the ordinary course of business, do not have a bargaining power over its image with his/her employer.  Only an independent contractor may claim any rights or violations of rights under the Act.

In the instant case, the jockeys first negotiated the use of their image with the original owner of the former El Comandante Race Track, and later with the successor owner and plaintiff herein, Camarero Race Track Corp.  As stated above, plaintiffs herein, Camarero and CHPR, agreed to establish a fund to pay for certain benefits to the jockeys, such as, the payment of the health insurance plan; accident insurance plan; life insurance policy, and the policy of the Puerto Rico State Insurance Fund, which must be paid individually by all independent contractors, in exchange for the

use of the image of a jockey or jockeys as "accessory figures" under Section 3151(g) the Act, and as an exception under Section 3157(a) and (d) of the Act.

In a nutshell, this matter was settled in a business decision fashion that was convenient for both the plaintiffs and the jockeys, and at the time frame wherein the jockeys were considered independent contractors under the law. The Court emphasizes that the core of this case is not the use of the image, but the jockeys' request for an increase on the horse mount, which is a matter of exclusive jurisdiction to the Puerto Rico Horse Racing Board, as thoroughly discusses above.[12]

**Conclusion**

For the reasons set forth above, the preliminary injunction and the memorandum in support of preliminary injunction requested by CHPR filed at Docket No. 153, is granted. Camarero's Memorandum in Support of Preliminary Injunction filed at Docket No. 154, is noted.

Hence, this case now moves to the damages stage.

The parties are granted ninety days to make discovery as to damages only. **A Discovery Status Conference is set for February 26, 2018 at 10:00 a.m.**

The request for lawyers' fees is denied at this time without prejudice, as plaintiffs have not placed the Court in a position to make a finding of temerity nor have plaintiffs complied with the

---

[12] Curiously, the plaintiffs have continued with the agreement entered into between Camarero and the CHPR on January 23, 2007. *See* Plaintiffs' Exhibit No. 2 of July 19, 2016, at pages 8-9. Notwithstanding that "sporting" ... events are not covered under the Right of Publicity Act, as well as, "legitimate public interest matters." 32 L.P.R.A. § 3157(a).

jurisprudence as required to a request of this nature.[13]

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 30th day of September, 2017.

s/Daniel R. Dominguez
DANIEL R. DOMINGUEZ
United States District Court

---

[13]     Temerity request shall include a memorandum with sworn statements as to the amount per hour, per lawyer assigned to this case and working on this matter; the specific number of hours worked and the rate per hour per attorney, all pursuant to *Coutin v. Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331 (1st Cir.1997); *Torres Rivera v. O'Neil Cancel*, 524 F.3d 331, 335 (1st Cir. 2006); *De Jesus Nazario v. Morris Rodriguez*, 554 F.#d 1966 (1st Cir.2009).  On the other hand, costs constitute a matter to be awarded to the prevailing party.  *See* Local Rule 54.