**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **CONFEDERACION HIPICA DE PUERTO RICO; CAMARERO RACE TRACK CORP.**<br>PLAINTIFFS<br><br>**v.**<br><br>**CONFEDERACION DE JINETES PERTORRIQUENOS, INC.; ASOCIACION DE JINETES DE PUERTO RICO**<br>DEFENDANTS | CASE NO.:   CV-02256 (DRD) |

**OPPOSITION TO PLAINTIFFS' REQUEST FOR SUMMARY JUDGMENT**

COME NOW, Defendants/Counter-Plaintiffs Confederación de Jinetes Puertorriqueños, Inc. (CJP) and its members who have been served, represented by undersigned attorneys, who in opposition of Plaintiff/Counter-Defendant Camarero's Motion For Summary Judgment respectfully state, allege and pray as follows:

**INTRODUCTION AND FACTUAL BACKGROUND**

CJP is a non-profit labor organization, organized for the purpose of defending and procuring Puerto Rico's jockeys rights, and to seek different types of benefits for its members. Around the time this complaint was filed CJP is was comprised of approximately 22 members in the Island and approximately 70 others who have been forced to seek a livelihood in the continental United States. Today, there are very few jockeys left in the Island due to the discriminatory living conditions they face, and the horse racing industry is on the verge of extinction.

Camarero is a corporation organized under the laws of Puerto Rico for the purpose of gambling. Ervin Rodriguez is the President of Camarero and Alex Fuentes is its Vice–President. The Board of Directors of Camarero is composed of several members, some who are horse owners, part of CHPR, or do business as independent owners.

CHPR is also a corporation created under the laws of Puerto Rico to represent horse owners. Besides the CHPR there is ate least 1 other entity that represents owners, known as the Puerto Rico Horse Owners Association (PHROA), and other independent owners.

For many years the CJP has been requesting from horse owners and the government entities that govern the sport to bring the mount fees to similar rates pays to jockeys in similar class of racetracks in the continental United States. This, because the personal and physical sacrifices, and perils horse racing entails for them and their families are the same, yet the pay is not. Horse owners from Puerto Rico also own horses in the continental United States and/or ship horses to race in different racetracks there. Yet they pay a jockey in the continental United States a bare minimum of $45.00 for a mount, while in Puerto Rico they pay have been paying jockeys for over 25 years a fee of $20.00 (See Docket 89-1, Affidavit from jockey John Velázquez in support of Jockey Guild's motion).

CJP contends the individual riders have a right to refuse to ride and/or to strike in accordance with the Law 83, and the Rules and regulations approved by the Puerto Rico Racing Board (Junta Hípica de Puerto Rico), after having followed all requirements set forth by Puerto Rico Law in an effort to avoid said action.

When everything else failed and after CHPR refused to attend a special mediation meeting called by the Puerto Rico labor Department, 37 individual jockeys decided in their personal capacity they would not accept mounts, and instructed the Racing Secretary to that effect. As a result races were not held at the Camarero Racetrack on June 30, July 1 and 2, 2016. Plaintiffs, Confederación Hípica de Puerto Rico, Inc. and Camarero Racetrack Corp. filed suit against CJP, Asociación de Jinetes de Puerto Rico, Inc., and several personally named individual jockeys, their spouses and their respective conjugal partnerships.

The complaint in this matter alleging a concerted refusal to deal under the Clayton Act, 15 USC § 15 and the Sherman Antitrust Act 15 USC § 1-7 was filed on June 30, 2016.  On July 11, 2016, this Court entered an amended *Nunc Pro Tunc* Opinion and Temporary Restraining Order, which concluded that a temporary restraining order is warranted and ordered the jockeys and their respective associations to immediately desist from any boycott against the Plaintiffs.

On August 19th, 2016 CJP and its members who were served answered the Complaint and filed a Counter Claim against the Defendants, among other things, for violations of the Sherman Act and the Clayton Act. Counter Defendant CHPR answered CJP's Counter Claim on September 9th, 2016.

CJP raised the following Affirmative Defenses with their answer:

1. Lack of subject matter and/or personal jurisdiction.
2. Plaintiffs fail to state a claim upon which a relief may be granted.
3. Plaintiffs are barred from their request due to their own actions
4. Absence of indispensable parties.
5. Plaintiffs have not come before the Court with clean hands.
6. Plaintiffs' causes of action are time barred.
7. Any and all others available to them.

A TRO was granted by the Court on July 9, 2016. Pursuant to the TRO, the jockeys and their respective associations were ordered to immediately desist from any boycott against the plaintiffs. See Docket Nos. 41, 23. 33. 37, 46 and 113 and the case continued as to the Preliminary Injunction, Permanent Injunction, and CJP's counterclaim. An Amended Opinion and Order was issued by the Court on August 11, 2017 (Docket 214), which CJP respectfully requests be revisited.

### CJP'S CONTESTED STATEMENT OF FACTS FACTS

In an attempt to distract the Court and unjustifiably fill their pockets, Plaintiffs have submitted to the Court a selective Statement of Uncontested Facts, which CJP to follow enumerates with its respective RESPONSE.

**1. Defendants boycotted the scheduled racetrack horse races in June 30, July 1 and July 2, 2016. Stipulated Fact V and Stipulated Fact U and Docket No. 153, cited in Docket No.214 at p. 8; Docket no. 154, Stipulated fact N.**

RESPONSE: As to this allegation it has been established and accepted by Plaintiffs that the riders that decided not to participate in the races in June 30, July 1 and July 2, 2016 did so in their individual capacity. Therefore CJP understands Stipulated Fact V and N have been taken out of context.  Plaintiffs have not provided any witness with personal knowledge to prove any concerted action by CJP. To the contrary, the evidence shows, and the Court stated there is a genuine dispute on weather the riders had a right to strike. CJP contends that this right was granted to them by **Article 12 (15) of Law 83** and Rules of the P. R. Racing Administration.

**2. Plaintiffs, "CHPR", and Camarero filed suit against Confederación de Jinetes and Asociación de Jinetes, for the illegal antitrust violation of a concerted refusal to deal by the two defendants associations and the individual jockeys to said entities. Id.**

RESPONSE: There is no controversy that Plaintiffs in deed filed a suit against Confederación de Jinetes and Asociación de Jinetes de Puerto Rico, Inc. and against the individual jockeys members of said entities. The complaint included individual jockeys and respective conjugal partnerships.

**3. On July 9, 2016, the Court issued a Temporary Restraining Order ("TRO"), based on the fact that defendants jockeys have traditionally been considered to be independent contractors, who were engaged in a "concerted refusal to deal" in violation of the Sherman and Clayton Acts. Further, that they were not covered by the "labor dispute exception" as expressed in a similar situation of jockeys versus management of the racetrack and horse owners, San Juan Racing Association, Inc. v. Asociación de Jinetes de Puerto Rico, Inc., et al., 590 F.2d 31, 32 (1st Cir.1979) (confirming antitrust injunctive relief as to a "concerted refusal to deal" by the jockeys against management of the racetrack). See Docket Nos. 41, 23, 33, 37, 46 and 113.**

RESPONSE: There is no doubt that the Court issued a Temporary Restraining Order (TRO) based on the fact that jockeys have been traditionally considered to be independent contractors. However, the jockeys have provided the court with evidence that their economic conditions are not the same that of jockeys who ride in the continental United States. Also, evidence has been brought before the Court of the disparity and inequality in wages for the same job between the jockeys in the United States and Puerto Rico. Therefore, a genuine issue of material facts exist as to weather there is a violation of the equal protection clause and other laws. Furthermore, as recent as this week, the only mechanism available to the jockeys to increase their fees and income, as determined by the Court, was the Racing Board, which no longer exist.

**4. The only defendant active at this stage of the proceedings is CJP, as Asociación de Jinetes de Puerto Rico, Inc. ("Asociación") entered into a Settlement Agreement with plaintiffs herein. Hence, Asociación is no longer a party in this case. See Amended Judgment of August 18, 2017, Docket No. 207.**

RESPONSE: Plaintiffs state that the only Defendant at this stage of the proceedings is CJP, and that Asociación de Jinetes entered into a Settlement Agreement with plaintiffs. However the conjugal partners and/or partnerships for the individual members of the Asociación de Jinetes de Puerto Rico are not part of or released in said agreement. Therefore, a controversy over a material issue of this fact exists.

**5. After evidentiary hearings held and memorandums by all parties submitted, on November 8, 2017 this Court issued an Amended Opinion and Order granting the Preliminary and Permanent Injunction, and the case was moved to the damages stage. See Docket No. 214.**

RESPONSE: No question as to the Amended Opinion and Order (Docket 214) issued by the Court in this case granting a Preliminary Injunction requested by plaintiffs (Docket 153). However, circumstances surrounding this case and the perils of disappearing that the racing industry in Puerto Rico is facing, merit the Court to revisit the issues brought to its consideration by the CJP.

In said Amended Opinion and Order, (Docket 214), filed in August 11, 2017 specifically expressed that the "core of this matter is whether the CJP, which is an independent jockeys' association, may also be considered a labor union, and as such, have a right to call strikes to force plaintiffs **to increase their horse mount fees**. It is important to note that CJP are currently not employees of CHPR and/or Camarero. **Notwithstanding, there are two additional issues pending: whether the jockeys may call a strike to force plaintiffs to increase their horse mount fees, and other economic considerations, such as protection of their image in commercial advertising of the Camarero Race Track.**"

These issues are still pending and need to be addressed, particularly when since the Racing Board has been inoperative for the greater part of the past two years, and it has recently been eliminated by a law that was signed a week ago. As a matter of fact, the whole Puerto Rico Horse Racing Administration has been wiped out and substituted by a gambling commission whose 7 members are not required to have any knowledge of the horse racing industry.

**6. On March 27, 2018, Camarero sent CJP's counsels an updated summary of all damages to be claimed in this case, showing total losses of $636,813 of which $338,266 were caused to Camarero and $298,547 to CHPR.** *See* **Exhibit 2, email of March 27, 2018 and attachments.**

RESPONSE: Camarero and CHPR have claimed damages without providing evidence of the income generated by 4 additional race days they were granted by the Horse Racing Administration and the Racing Board, in substitution of the 3 days there were no races. Plaintiffs also fail to disclose to the Court any income the have obtained as a result of claims to their insurance company for business interruption.

7. **During the status conference held on March 28, 2018, Plaintiffs informed the Court that they had submitted to Confederación de Jinetes an assessment of the damages suffered during the three (3) days of the illegal boycott and Defendant acknowledged having been furnished with the damage report. Docket No**. *222.*

RESPONSE: Plaintiffs sent to CJP what their respective allegation of damages were, however said damage report was objected in said conference for plaintiffs did not provide CJP nor the court with a copy of a report regarding the money made from **4 days of additional races**, put in place by the Racing Administration to compensate for the 3 days that races were not held. Therefore, there is a controversy of a material fact as to weather the assessment provided by plaintiffs is accurate and is unjust enrichment is present.

8. **On June 9, 2018, Camarero sent Confederación de Jinetes an Answer to Interrogatory and Production of Documents.** *See* **Exhibit 1.**

RESPONSE: Camarero sent an incomplete and evasive Answer to Interrogatory and Production of Documents, avoiding disclosure of the information regarding the earnings of the 4 additional days added to the racing calendar, and information regarding compensation from their insurance company policies for business interruption. This has been a willful act by this plaintiff, and it generates a controversy over the amount claimed, or weather the Plaintiffs mitigated and/or suffered any losses at all.

9. **On May 30, 2018, CHPR also answered an Interrogatory and Production of Documents.** *See* **Exhibit 1a.**

RESPONSE: CHPR sent an incomplete Answer to Interrogatory and Production of Documents, avoiding to disclose information regarding the earnings of the 4 additional days added to the racing calendar, and information regarding compensation from their insurance company policies for business interruption. This has been a willful act by this plaintiff, and it generates a controversy over the amount claimed, or weather they suffered any losses at all.

10**. Camarero expressed in the answers to interrogatory and production of documents that all the evidence regarding the damages suffered was produced on March 27, 2018.** *See* **Exhibit 1.**

RESPONSE: A complete copy of the Interrogatory, the Request for Documents, and Camarero's Answers is attached as (**Exhibit 1** of this opposition). Relevant documents like income tax returns, financial reports, and insurance policies were requested from Plaintiffs in order for CJP to be able to explore the veracity of the

alleged damages and Plaintiffs simply did not provide them. To follow, some of the

questions and answers posed to Camarero.

*5. Provide a certified copy of all of your income tax returns for the years 2007 through 2017.*

5. Camarero objects this interrogatory because it is irrelevant. The information requested is immaterial and not relating to the matter at issue, to wit, the damage suffered by Plaintiffs due to the jockeys' boycott.

*6. Provide a certified copy of all the financial statements provided to the Racing Board of*
*Puerto Rico from 2007 through 2017, including all income received from the video lottery system.*

6. Camarero objects to this interrogatory because it is extremely broad in scope and constitutes a fishing expedition for an irrelevant purpose. The information requested from year 2007, that is nine years before the jockeys' boycott is totally immaterial and is not related to the matter at issue, to wit, the damages suffered by Plaintiffs due to the jockeys' boycott in mid 2016.

Notwithstanding the objection, Camarero only files certain financial statements with the Board upon renewal of its license. These statements are filed under a confidentiality agreement with the Racing Board. Camarero would have no objection to produce exclusively the financial statements for the years 2015 through 2016 provided Defendants enter into a confidentiality agreement with Camarero.

RESPONSE: Plaintiffs did not comply with the requested documents, which are

indispensable in order for Defendants to evaluate the claim for damages Plaintiffs

pretend the Court to grant them.

**11. Camarero's loss in commissions from direct and continuing wagering was $144,607.00 and $146,160.00 respectively. Exhibit 2; Exhibit 3, Unsworn Declaration under Penalty of Perjury of Stanley Pinkerton; Exhibit 4, email of March 28, 2018 with attachments.**

RESPONSE: Camarero's claim for loss in commissions from wagering was not

accompanied by a Sworn Declaration under Penalty of Perjury, which brings a

controversy over a material fact as to the truthfulness of said declaration.

**12. Camarero's loss for programs sales was $1,356.00. Exhibit 2; Exhibit 3: Unsworn Declaration under Penalty of Perjury of Stanley Pinkerton.**

RESPONSE: Camarero's claim for loss of program sales was not accompanied by a Sworn Declaration under Penalty of Perjury, which brings a controversy over a material fact as to the truthfulness of said declaration.

**13. Camarero's loss for "service impresos" revenues was $2,044.00. Exhibit 2; Exhibit 3, Unsworn Declaration under Penalty of Perjury of Stanley Pinkerton.**

RESPONSE; Camarero's claim for loss for "service impresos" revenues was not accompanied by a Sworn Declaration under Penalty of Perjury, which brings a controversy over a material fact as to the truthfulness of said declaration.

**14. Camarero's loss for VLT revenues was $36,214.00. Exhibit 2; Exhibit 3, Unsworn Declaration under Penalty of Perjury of Stanley Pinkerton.**

RESPONSE: Camarero's claim for loss for VLT revenues **was not** accompanied by a Sworn Declaration under Penalty of Perjury, which brings a controversy over a material fact as to the truthfulness of said declaration.

**15. Camarero's loss for food commissions was $7,866.00. Exhibit 2 Exhibit 3, Unsworn Declaration under Penalty of Perjury of Stanley Pinkerton; Exhibit 4.**

RESPONSE: Camarero's claim for loss for food commissions was not accompanied by a Sworn Declaration under Penalty of Perjury, which brings a controversy over a material fact as to the truthfulness of said declaration.

**16. The total of economic damages caused by the jockeys boycott on June 30, July 1, and July 2, 2016 to Camarero are $338,266.00. Exhibit 2; Exhibit 3, Unsworn Declaration under Penalty of Perjury of Stanley Pinkerton.**

RESPONSE: Camarero's claim for loss for economic damages was not accompanied by a Sworn Declaration under Penalty of Perjury, which brings a controversy over a material fact as to the truthfulness of said declaration.

**17. The total of economic damages caused by the jockeys boycott on June 30, July 1, and July 2, 2016 to CHPR are $298,547.00. Exhibit 2; Exhibit 3, Unsworn Declaration under Penalty of Perjury of Stanley Pinkerton.**

RESPONSE: CHPR's claim for loss for economic damages was not accompanied by a Sworn Declaration under Penalty of Perjury of any financial officer of the corporation, which brings a controversy over a material fact as to the truthfulness of said declaration. Plaintiffs were asked (questions in italics) to:

*8. Provide copy of any and all contracts having to do with the distribution of purse monies, the video lottery system, and any other earnings perceived the above captioned plaintiffs. Do we have any?*

8. **See Exhibit A, the Contract with the Horse Owners Confederation, with an original term that initially ran from January 5, 2007 through December 31, 2010. Although it expired long ago, it continues to be in effect on a month-to-month basis up through present date**. Outside of that, any Racing or VLT related matters, including overall commissions distribution, is governed at the highest level by Puerto Rico Racing Law, and any Orders issued by the PR Racing Board and/or its administrative arm, the PR Racing Administration. Relative to purses in particular, those governmental entities compile and issue a Racing Plan for each year, any and all of which are made accessible to any and all interested parties, by the PR Racing Administration.

This answer is incomplete for there are several contracts that were signed between Plaintiffs in which they distribute revenues without CJP or any jockey participation in the matter. Regarding the contract between Camarero and the Horse Owners Confederation, for years it was the narrative and imposition by the Racing authorities that CHPR had the authority to represent all owners and that the agreements they reached was binding to all other horse owners.

However, this Honorable Court should take judicial notice that said interpretation was rejected by the Supreme Court of Puerto Rico in: **Puerto Rico Horse Owners Association (PRHOA) v. Confederación Hípica de Puerto Rico**, 2019 TSPR 94, where the Islands highest Court concluded that "**The members of PRHOA are not bound to the obligations and benefits agreed by in the contract between the Confederación and Camarero."** Therefore, CHPR does not have the authority to represent other organizations, group or independent owners in any contract or forum, including in this case, and a controversy of a material fact is also present in the case as to weather the horse owners in Puerto Rico that have been excluded are **indispensable parties** in the case.

As the Court well knows, Rule 12(b)(7) is governed by Rule 19 which establishes that "The Court may dismiss an action when there is an absent party without whom complete relief will not be possible or whose interest in the controversy is such that to proceed without the party might prejudice it, or the parties already present."

In sum, plaintiffs conveniently address the issue of the alleged economic losses by hiding the true income and/or railroading their report by way of an Unsworn Declaration of Camarero's Financial Officer, without providing defendants or the Court with a financial report that includes income they received during the 4 racing days added to the year calendar, put in place to make up for the 3 days the races were not held. As stated above, there are several controversies regarding the facts and alleged loses brought presented by plaintiffs which may ultimately lead to an unjust result and enrichment.

On the other hand, plaintiffs completely failed to address the other issues pending before this Court, that have been determined will be addressed at the scheduled trial. Therefore, and for the reasons here stated the request for summary judgment should be DENIED, Plaintiffs Complaint should be dismissed, and an evidentiary hearing or trial should be set regarding CJP claims and/or jockeys labor and constitutional rights in Puerto Rico.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, "[s]ummary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits." Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008) (quoting the former Fed. R. Civ. P. 56(c)).

When ruling on a motion for summary judgment, the court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences." Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005). However, the non-movant "must point to competent evidence and specific facts to stave off summary judgment" in order to defeat a properly supported motion for summary judgment. Tropigas de Puerto Rico v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir.2011). Thus, the Court may "afford no evidentiary weight to conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative." Id. (quoting Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001) (internal quotation marks omitted)).

In addition, the "absence of evidence on a critical issue weighs against the party—be it the movant or the non movant—who would bear the burden of proof on that issue at trial." Alamo Rodríguez v. Pfizer Pharma., Inc., 286 F. Supp.2d 144, 151 (D.P.R. 2003) (citing Pérez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001)). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Thompson, 522 F.3d at 175 (citing Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)) (internal quotation marks omitted). "A fact is material if it has the potential of determining the outcome of the litigation." Maymí v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008). To defeat a properly supported motion for summary judgment, evidence offered by the non-movant "must be significantly probative of specific facts." Pérez, 247 F.3d at 317 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). Plaintiffs did not provide any witness with personal knowledge of any meetings or conversations between the jockeys planning a boycott.

As a rule, "[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." Vázquez v. López-Rosario, 134 F.3d 28, 33 (1st Cir. 1998). Furthermore, as stated by the U.S. Supreme Court, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Anderson, 477 U.S. at 255. The trial court may not grant "summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." Id. (citing Kennedy v. Silas Mason Co., 334 U.S. 249 (1948).III.

**ARGUMENT**

In their request for Summary Judgment Plaintiffs only focus on the alleged lost of income due to the 3 days there were no races at Camarero. However, they have not provided Defendants and fail to bring to the Court evidence of the revenues they received **for the 4 race days that they requested and were put in place by the racing authorities in order to "make up" for those 3 days**. Plaintiff Camarero also has failed to provide evidence regarding any insurance policy that might have covered loss of income or business interruption. Plaintiffs claims are not plead with enough or true factual content as to allow the Court to draw a reasonable inference that CJP is liable for the damages they claim. Plaintiffs have also failed to prove the alleged intentional misconduct or conspiracy. Much to the contrary, the evidence presented to this Court proves that jockeys were being, and have been abused by Puerto Rico Racing Administration officials and that was what led to their protest.

The discriminatory conditions that jockeys have endured for years in Puerto Rico are taking its toll. The jockeys from Puerto Rico are reputed as some of the best in the world, but due to the unfair earnings and conditions they face in the Island, they have been leaving the Island and, forced to find other jobs, or to retire; and will continue to do so until a radical change is made. As an example CJP submits to the Court that out of the 37 jockeys eligible to ride ate the time of the incident under the consideration of the Court, only 19 are still in the Island. Jockey in Puerto Rico are entitled to earn the same mount fee they earn in the continental United States. They are entitled to the equal protection under the law, among other protections granted under the United States Constitution.

On the other hand, CJP concurs, adopts Affidavit filed jockey John Velázquez (Docket 89-1) and arguments made by the United States Jockey Guild, and affirmatively argues that the TRO and Preliminary Injunction in this case were granted pursuant to the Court's authority under the Sherman Act, 15 U.S.C. § 1 *et seq.,* and particularly the first section of the Sherman Act, which renders unlawful "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." It is clear that the antitrust laws regulate only combinations that are in restraint of commerce.

The Clayton Act, Section 6, 15 U.S.C. § 17, states that "[t]he labor of a human being is not a commodity or article of commerce."  Since the jockeys are solely declining to supply their human labor, their conduct in combining to do so cannot be a breach of Section 1 of the Sherman Act.

CJP also respectfully submits that the cases on which the Court relied in issuing this TRO do not apply to the conduct of the jockeys who are not engaged in an entrepreneurial activity involving the sale of a product other than their human labor cannot be deemed an article of commerce.

I.   **THE *SAN JUAN RACING ASSOCIATION* DECISION IS NOT PERSUASIVE AUTHORITY FOR THIS TRO.**

At first blush, it seems inevitable that the prior injunction stopping a jockey strike at Puerto Rico's only track (albeit with a different owner) would be determinative of this dispute.  However, the particular circumstances of the prior ruling in *San Juan Racing Association*, *supra*, renders it largely irrelevant to this dispute.  In the *San Juan Racing Association* case, there was no contention that the defendant jockeys and their jockey association fall within the labor exemption to the

antitrust laws. Furthermore, there was no contention that jockeys were exempt from antitrust law under the Clayton Act, Section 6, precluding treatment of human labor as an article of commerce. The principal basis on which the CJP urges this Court to dissolve this TRO and to not enter a preliminary injunction was simply not argued in the prior litigation. It was not argued in the prior litigation that other applicable rulings and/or decisions from Puerto Rican authorities or labor regulating boards established that the jockeys' organization was recognized as a bona fide jockeys' organization. The *San Juan Racing Association* court also did not recognize that Section 1.502 of the National Labor Relations Board ("NLRB") Procedural Manual specifically states that the NLRB has no jurisdiction over racetracks.

Further, despite the lack of argument on that score, the First Circuit was troubled by the sparse factual record and by the result that jockeys could be compelled to ride under the applicable antitrust law:

> While we sense an inappropriateness about characterizing jockeys seeking an increase in their compensation as would-be monopolists equal to that of treating ruggedly individualistic lobster fishermen as antitrust conspirators, *cf. United States v. Maine Lobstermen's Ass'n*, 160 F. Supp. 115 (D. Me. 1957), we conclude on the basis of this sparse record, that the judgment must be affirmed.

*San Juan Racing Ass'n*, 590 F.2d at 33.

CJP submits that a fuller record on the actual services that jockeys provide for the owners and trainers for which they ride will demonstrate that they are not entrepreneurs but manual laborers whose human labor cannot be deemed to be an article of commerce under the anti-trust laws.

II.   **THE OTHER CASES RELIED UPON BY THE COURT DO NOT SUPPORT THE INJUNCTION BECAUSE THOSE CASES INVOLVE ENTREPRENEURIAL CONDUCT BEYOND THE PROVISION OF HUMAN LABOR.**

*Taylor v. International Union of Journeymen Horseshoers*, 353 F.2d 593 (4th Cir. 1965), does not support the injunction entered by the Court herein.  The key dispute between the farriers and horse trainers in *Taylor* was over market access, *i.e.*, farriers at a Maryland racetrack refused to shoe any horses for certain Canadian horse trainers who were active at that Maryland track unless the Canadian trainers signed an agreement to use only union members regardless of where their horses raced, either in the United States or Canada.

Such monopolistic conduct – control over market share – is outside of any employment context.  Section 6 of the Clayton Act, 15 U.S.C. § 17, states: "the labor of a human being is not a commodity or article of commerce" and permits labor organizations to "carry[] out the[ir] legitimate object[ive]."  The analysis of the farriers' business in *Taylor* demonstrates that the farriers sold a product, *i.e.*, horseshoes, over which they possess and demonstrate entrepreneurial control.  The *Taylor* court held that:

> The farrier's income is dependent, at least to some extent, on factors which are without the control of the trainer.  In addition to the farrier's sole determination of when, where, how long and for whom he will work, he controls his own income through his complete control of the price of his services and the risk of profit and loss involved.  The District Court found that the farriers sell shoes at cost without calculating a profit on resale.  This is generally true when a certain type shoe is used but the evidence disclosed the practice of manufacturing various types of steel shoes in volume for later sales to trainers.  Error of judgment in the amounts and types of shoes manufactured by the farriers could clearly result in profit or loss and in this respect they run the same risk as any manufacturer.  The price they pay for their tools, the type of tools purchased, the cost of printed billheads, the type of car or truck used for travel from one track to

> another and the cost of maintenance and operation, are all variables which affect income. In addition, the individual farrier decides for himself whether to employ an apprentice and it was shown that employment, at fixed wages, of an apprentice is quite expensive and is of no real advantage to a farrier; consequently, employment of an apprentice means a reduction in net income.

*Id.*, 353 F.2d at 599.

The issue resolved by the court in *Taylor* was limited to the ability of these independent entrepreneurial businessmen to collectively refuse to deal with certain horse trainers who refused to agree to solely utilize union-affiliated farriers in Canada. While the farriers had established a minimum price for their services, the record is clear that the dispute considered by the court was not limited to the issue of the pay they received for providing farrier services. The Camarero Jockeys have not made any demands concerning the jockeys who the owners and trainers at Camarero can and do employ at other tracks in the United States.

*Columbia River Packers Association Co. v. Hinton*, 315 U.S. 143 (1942), is similarly focused on an entrepreneurial dispute. *Columbia River Packers* involved a dispute between the Pacific Coast Fisherman's Union over a provision in its constitution and bylaws that union members should not "deliver catches [of fish] outside of Union agreements," and union fishermen refused to sell fish to buyers who did not agree to purchase fish exclusively from union members at prices established by the union. *Id.* at 145 (internal quotation marks omitted). The Supreme Court correctly held that "[t]he controversy here is altogether between fish sellers and fish buyers." *Id.* at 147. The fishermen were engaging in a strike to drive up the cost of their product, *i.e.*, fish, not the fees the fishermen received directly for their manual labor. As the court held, the history of the labor exemption from the

antitrust laws makes "it clear that the attention of Congress was focused upon disputes affecting the employer-employee relationship, and that the Act was not intended to have application to disputes over the sale of commodities."  *Id.* at 145 (citation omitted).  The Camarero Jockeys are not, of course, engaged in the sale of any commodities.  (Velazquez Decl., ¶ 4.)

In *Milk Drivers' Union v. Lake Valley Co.*, 311 U.S. 91 (1940),  a union of milk wagon drivers, employed by local dairies in delivering milk from door to door to retail customers, picketed a number of retail stores which sold, at cut prices on the cash-and-carry plan, milk bought at wholesale from individuals called "vendors." The controversy was over the price of their product, *i.e.*, milk, not the fees the milkmen received directly for their manual labor. Notwithstanding the reality that the dispute was over the price of a product, the court held that the case arose out of and involved a "labor dispute"; that all of the parties had direct or indirect interests in the production, processing, sale and distribution of milk; and that the Norris-LaGuardia Act applies to "labor disputes" between persons who are engaged in the same industry, trade, craft or occupation, or have direct or indirect interests therein. *Id.* at 97-98.  The court reached the conclusion that the relationship of employer-employee was the matrix of the controversy, despite the fact that the focus of the dispute was market share in the milk industry.  *Id.* at 98-103.

In *Conley Motor Express, Inc. v. Russell*, 500 F.2d 124 (3d Cir. 1974), the court held that owner-operators of trucks that they leased to Conley Motor Express could be enjoined from refusing to furnish trucking services in support of their demand for higher lease fees from Conley.  *Id.* at 127.  The striking owner operators were not

seeking direct pay for their manual labor but lease payments for their providing trucking services with their independently owned trucks.  The court, affirming the district court's grant of the preliminary injunction, ruled:

> "We recognize that by the terms of the statute there may be a 'labor dispute' where the disputants do not stand in the proximate relation of employer and employee. But the statutory classification, however broad, of parties and circumstances to which a 'labor dispute' may relate *does not expand the application of the Act to include controversies upon which the employer-employee relationship has no bearing*." . . . Regardless of how [the owner operators] may seek to characterize their objectives in picketing, [the owner operators] have failed to show that the employer-employee relationship forms the matrix of their controversy with Conley.

*Id.* at 126-27 (quoting *Columbia River Packers*, 315 U.S. at 146-47) (emphasis original).

Finally, in *Betteroads Asphalt Corp. v. Federación de Camioneros de Puerto Rico, Inc.*, 391 F. Supp. 1035, 1039 (D.P.R. 1975), the court held that the dispute being adjudicated was not one concerning "terms or conditions of employment." The picketing group was an association of truck owners, and the court concluded that it was "faced here with a group of independent business men attempting to take away the business of another group of independent business men, and thus are dealing with non-labor groups." *Id.* (citations omitted).  The Camarero Jockeys are not trying to take work from anyone.  Their sole goal is to increase the payment they receive for riding race horses, owned by others, and to seek better working conditions in general, which is a classic example of workers seeking to improve the payment they receive for their human labor and other conditions associated with their dangerous profession.  (Velazquez Decl., ¶¶ 5-6.)

III.   **THE EMPLOYMENT NEXUS TEST IS MET HERE BECAUSE THE JOCKEYS ARE A LABOR GROUP EVEN IF THEY ARE ALSO INDEPENDENT CONTRACTORS.**

On July 11, 2016, this Court entered an amended *Nunc Pro Tunc* Opinion and Temporary Restraining Order concluding that the jockeys cannot rely upon the "labor dispute" exception under the antitrust laws because the Camarero Jockeys are independent contractors.  For purposes of this brief, CJP accepts, for the sake of argument, the Court's determination that these jockeys are independent contractors but respectfully submits that an independent contractor has the same rights to be free of anti-trust scrutiny of their provision of human labor.

CJP recognizes that the Supreme Court has repeatedly held that the employer-employee matrix must be central to any dispute where a party seeks to invoke the labor anti-trust exemption.  For example, in *Columbia River Packers*, the Supreme Court held that:

> We recognize that by the terms of the statute there may be a "labor dispute" where the disputants do not stand in the proximate relation of employer and employee. But the statutory classification, however broad, of parties and circumstances to which a "labor dispute" may relate does not expand the application of the Act to include controversies upon which the employer-employee relationship has no bearing.

*Id.*, 315 U.S. at 146-47.

In *Taylor v. International Union of Journeymen Horseshoers*, *supra*, the court determined that the farriers and the complaining owners and trainers "do not stand in the proximate relation of employees and employers" and "fail[ed] to discover the existence of any employer-employee relationship which is the 'matrix' of this controversy or any condition which, under the provisions of either the Clayton Act

or the Norris-LaGuardia Act, would protect the activities of" the farriers.[1]  *Id.*, 353 F.2d at 606.

Neither *Columbia River Packers* nor *Taylor* discuss the provision of the Clayton Act, Section 6, stating that the labor of a human being cannot be deemed to be an article of commerce.  It was unnecessary for those courts to analyze Section 6 since in each case the conduct involved more than human labor, *i.e.*, the selling of fish in *Columbia River Packers* and the making and selling of steel horseshoes in *Taylor*.

The labor exemption to antitrust regulation is not limited to the traditional employer-employee context.  The Supreme Court has held that when applying the labor exemption anti-trust analysis, "[m]ost assuredly included in the 'labor group' ambit are parties having an economic interrelationship affecting legitimate union interests, *even where such parties are not traditional labor organizations*."  *USS-Posco Indus. v. Contra Costa Bldg. & Constr. Trades Council*, No. C87-4829-DLJ, 1990 U.S. Dist. LEXIS 11360, at *12 (N.D. Cal. June 8, 1990), *aff'd in relevant part*, 31 F.3d 800 (9th Cir. 1994) (emphasis added) (citing *H.A. Artists & Assoc. v. Actors' Equity Ass'n*, 451 U.S. 704 (1981) (deeming theatrical agents subject to the actors' union licensing system as a "labor group" for antitrust analysis purposes); *Am. Federation of*

---

[1] In *Taylor*, defendant Local 7 also argued that the labor exemption was applicable because some of its members worked at times as common law employees of the race tracks, rodeos and annual trail rides.  *Id.*, 353 F.2d at 606.  The court summarily rejected this claim because there was no evidence that the boycotting and price-fixing activities of Local 7, which were the subject of the complaint, were undertaken in aid of or in connection with the wages, hours, working conditions or any other interest of horseshoers performing services for such race tracks and rodeos.  *Id.*

*Musicians v. Carroll*, 391 U.S. 99, 106 (1968) (determining that the orchestra leaders were a "labor group" and parties to a "labor dispute" because of the "presence of a job or wage competition or some other economic interrelationship affecting legitimate union interests between the union members and the independent contractors").

The employer-employee nexus test does not exclude independent contractors from the labor exemption from anti-trust regulation when those individuals, like the jockeys herein, are engaged in the sale of their labor, which is not an article of commerce under Section 6 of the Clayton Act.  (Velazquez Decl., ¶ 4.)

Finally, CJP respectfully brings to the consideration of the Court that although it has stated that all matters regarding an increase in mount fees and/or income was to be brought up to the Puerto Rico Racing Board (Junta Hípica), this is no longer an alternative, due to the fact that the Puerto Rico Horse Racing Industry Administration, along with the Racing Board has been terminated with the approval of a new gambling or betting Law signed and put into effect by Governor Ricardo Roselló Nevares before his resignation in July 2019. Therefore, absent any forum to address jockeys request to obtain an increase in their compensation, and to enjoy of the same income that for the same job is paid in the continental United States, CJP and its members pray for this Court to Deny the summary judgment that has been requested by Plaintiffs, for the dismissal of the complaint, and for the Court to continue the case as to the Counter Claim filed by CJP. Since there a Racing Board no longer exists in order to regulate the horse racing sport in Puerto Rico, the

controversies brought up before the Court by CJP regarding violations to constitutional dispositions should be now addressed, and remedies should be granted.


**WHEREFORE**, for the reasons stated above, CJP respectfully requests for the Court to deny Camarero's motion for summary judgment, and to provide any other remedy it deems just and adequate.


**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, August 7, 2016.

**WE HEREBY CERTIFY THAT** on this same date we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: **/s/  Axel A. Vizcarra-Pellot, Esq.**
# 304011
Ave. Isla Verde # 5900, L2/362
Carolina, Puerto Rico   00979
Tel. (787) 727-3000 / Fax. (939) 336-3992
axelvizcarra@icloud.com


By:  **/s/   PETER JOHN PORRATA**
#128901
**Law Offices of PETER JOHN PORRATA**
Capital Center Building
South Tower/Suite 602
239 Arterial Hostos Avenue
San Juan, PR  00918-1476
**email@peterjohnporrata.com**
T:  787.763.6500
F:  787.763.4566